# ATTACHMENT NO. 1

# REPORT OF CARY D. ROSTOW, PhD

P.S

**R-D Psychological Associates**
740 Colonial Drive
Baton Rouge, Louisiana 70806
*Phone:* (225) 216-9422
*Fax:* (225) 216-1260

**Cary D. Rostow, Ph.D., M.P.**
Medical Psychology
Clinical Psychology
Clinical Neuropsychology

# *Brownfield v City of Yakima (CIAW)*
# Case No. CV-08-3005-RHW

01-09-09

For the consideration of Mr. Jerry Moberg and associates

### Background

Dr. Cary D. Rostow, Police Psychologist, was contacted by letter on June 24, 2008 to inquire into a possible interest to service as an expert reviewer regarding the above captioned case (referred to as *Brownfield v City of Yakima* hereafter). Mr. Moberg and Dr. Rostow did not know each other, but Mr. Moberg knew of the book (Rostow, C.D. and Davis, R.D., A Handbook for Psychological Fitness for Duty Evaluations in Law Enforcement, 2004, Haworth Press, Inc., Binghamton, NY) for which Dr. Rostow had been senior author. Following a series of delays in response to availability issues, documentation was received by Dr. Rostow by October 29 and an analysis of material was undertaken.

Dr. Rostow's examined the psychological procedures and methodologies contained in *Brownfield v City of Yakima* Fitness for Duty Evaluation (FFDE) from the prospective of a police psychologist. The author was not an attorney and nothing in this report should be understood as legal advice. The analysis that follows is based on documentation received at the office of the examiner and no direct contact has been made with any party in the case, except with Mr. Moberg. Mr. Moberg requested a formal report in a communication of December 24, 2008.

Outtakes from that letter are included below, along with Dr. Rostow's responses to the statements or questions follows:

P.6

**(i)    a complete statement of all opinions the witness will express and the basis and reasons for them**

**Opinions:**

1. **Every police agency should have a policy manual or personnel code or civil service regulations that identified responsibilities and line of authority and generally indicates appropriate standards of behavior of serving officers.** The Yakama PD had a standard Policy and Procedure Manual that charged the Chief of Police with the maintenance and enforcement of disciple and supervision with the department (4.000.01), demanded that all employee be mentally and physically fit to perform duties when reporting for duty (5.04.00), that all officers will obey all lawful orders (7.03.00), that officers will not make public statements, other than clearly as a personal opinion, to the public by any media (7.05.00) and defines misconduct as on and off duty behavior that "negatively reflects on the Department, weakens effectiveness", as is standard in most police agencies.
2. **A FFDE is appropriate where there is some objective reason to believe that there was some medical or psychological impairment, even if the FFDE does not later sustain the finding of Unfitness.** On Standard Insurance Company Disability Claim Form and Standard Insurance Company Long-Term Disability Benefits Form dated 01/23/01, there appeared statements that Officer Brownfield sustained a serious head injury and required neuropsychological services (among others) indicating a reasons to believe that there was a history that could support possible cognitive or mental impairment.
3. **A FFDE is appropriate where there are objective, scientific test findings or reasonable professional opinions that there was a history of behavior or cognitive impairment that may impact public safety or affect the business necessity of the employers' requirements of employees.** The Neuropsychological Evaluation per Dr Richard Drew 07/06/01 noted "reduced self-awareness" of Officer Brownfield and recommended that "only observation on the job can accurately assess his abilities and judgment under those stressful conditions". This is evidence that that may be an expectation of a possible mental difficulty in the future for an armed, law enforcement agent.
4. **A FFDE is appropriate where the employee states or admits to an appropriate professional that he/she suffers significant behavior or medical problems and appears to require treatment.** The Neuropsychological Intake per Dr Richard Drew 01/02/04 reported that Dr Drew was approached by Officer Brownfield who reported problems with sensation, perception, motor control and emotional difficulties and that Officer Brownfield was in some form of psychotherapy, indicating to any concerned police psychologist that Officer Brownfield was suffering significant behavioral problems.
5. **An investigation in consideration of a possibly of a FFDE is appropriate where an armed, minimally supervised police officer expresses excessive emotionality or irritability.** In the Memo of 01/13/04 from Officer Brownfield to Chief Granato there appeared to be a mixture of anger, threats and irritability that

p.7

most Police Psychologists would consider appropriate grounds to investigate the use of a FFDE.

6. **An investigation in consideration of a possibly of a FFDE is appropriate where a subordinate officer exceeds his/her authority and intrudes into the supervisory prerogatives of superiors in a clamorous and insubordinate manner, suggesting possible mental impairment.** The memos of 06/17/04 through 08/15/04 seemed to be a complaint about the work habits of a coworker, Officer DeJournette (DJ), with demand that superiors or supervisors take action that Officer Brownfield considered to be appropriate. This is followed by memos 11/10/04 thought 05/04/05 in which Officer Brownfield gradually expresses a progressively more strident claim that Lt Merryman is "Lackadaisical" and has political motive to conspire with DJ to achieve impermissible outcomes. This sequence suggests that Officer Brownfield has lost his sense of responsibility to function within the department's organizational structure and had assumed a self-appointed supervisory role.

7. **A FFDE is appropriate were there the employee acts in a manner that is openly insubordinate (as in refusing commands) and to use vile language against superiors, if there is reason to suspect that the proximal cause is a medical or mental impairment.** The Memo of 05/11/05 from Sgt Amos to Chief Granato described how Officer Brownfield walked out of the meeting, cursed his superior officer and refused an order to return or discuss the matter, which would justify immediately suspension, pending a hearing, in most departments.

8. **A FFDE is appropriate when a serving officer admits to contempt for departmental rules, loss of emotional control in work situations, fear and emotional agitation in response to non-violent circumstances, a refusal of a direct order because of self-defined "unlawfulness" because it made him "emotional", distress that made his seek immediate professional mental health services as a result of occupationally related non-violent events and the expressed opinion that insubordination may not occur because of a special relationship with a superior or because of emotional arousal, because such behavior is impermissible and may be associated with mental impairments.** The unheaded Report of the Internal Investigation (#05-14) interview regarding the Conference Room Incident of 5/11/05 that was conducted on 5/18/05 supported the possibility of a psychological impairment and would certainly support a FFDE order in most departments. Concerns include the following: Officer Brownfield insisted that he can make his own rules for the department, such as being present when the lieutenant made a report to the chief (p. 15-16). Brownfield admitted to losing emotional control because the two persons that he has accused of unethical conduct were "flicking this thing back at me" (p. 20). Brownfield reported that he was "scared" and "agitated" because Merriman and Amos were agitated (p. 23). Brownfield said that the order to "sit" was not "lawful" because he was "consumed by fear and powerful emotions". Brownfield admitted trying to call his counselor, instead of returning to the meeting, due to his uncontrolled distress (p. 30-31). Brownfield made the argument that he had a special relationship with Sgt Amos and, therefore, refusing

a direct order is not insubordination. Brownfield argued that emotional dyscontrol is proof against insubordination (middle page 32).

9. **An investigation in consideration of a possibly of a FFDE is appropriate where the employee admits that he/she suffers significant behavior or medical problems in connection with require vocational skills.** An unheaded note of 07/09/05 indicated that Officer Brownfield admitted that he had a "hard time expressing himself and is often taken wrong" (regarding a citizen complaint). Every serving officer should be able to express himself verbally as a matter of business necessity.

10. **A FFDE is appropriate where the employee admits in an official legal document that he/she suffers significant behavior or medical problems and that such difficulty had motivated inappropriate conduct.** The Detail Report per Lt. Foley of 09/21/05 (Officer Brownfield said to have assaulted wife: no arrest due to lack of evidence) and the Petition for Order for Protections of 09/19/05 that followed contained Officer Brownfield's written admission: "because of a severe head injury due to an auto accident, I suffer from emotional impulsivity". Such a claim in a legal document is sufficient reason to suspend an officer from active duty and conduct a FFDE.

11. **An investigation in consideration of a possibly of a FFDE is appropriate where the employee demonstrated repeated disruptive and inappropriate behaviors of such a nature that it may reasonably be expected to reoccur and to affect departmental operations.** Interviews regarding a dispute between Officer Brownfield and female Officer Salinas as described in a note of 09/21/05 indicated yet another conflict between Officer Brownfield and an YPD officer and Officer Brownfield seemed to again claim that he could not restrain himself because he was overworked by the poor performance of colleagues.

12. **A FFDE is appropriate when an armed police officer makes written or verbal threats of bodily hard or injury, especially for reasons that are unconnected with the demands of physical confrontation with suspects.** Internal Investigation Summary (undated) indicted that Officer Brownfield made a written threat of bodily harm and sent it through the US mail to an associate of the threatened party. The explanation by Brownfield that no harm would come to Dr. Thompson (the dentist said to have had an intimate relationship with Officer Brownfield's estranged wife) if casually encountered, but not so under other circumstances, is problematic (in the direct threat sense) for most police psychologists and would likely call for a FFDE.

13. **A FFDE evaluation may be properly completed by a qualified examiner with or without the cooperation of the examinee's medical providers, since it is the burden of the examinee to provide appropriate documentation related to medical and psychological services or findings.** In the Report: Unfit for Duty per Dr. Decker 12/12/05 and Dr. Decker's Letter to Ms. Sophia Mabee (city attorney) or 03/15/06, Dr. Decker properly noted that Dr Gondo's failure to send records was not her burden and entitled her to conclude that there was not known treatment. Dr. Decker concluded that the MVA was the proximal cause of Officer Brownfield's emotional volatility and irritability. In the retuned Agreement Inquiry from Dr. Roy Gondo (Dr. Decker's letter of 03/28/06), Dr. Decker

concluded that Dr Gondo did not send any records, did not participate in the evaluation and his response is totally negative (no MRI findings), without the provision of any data or observations of his own.

14. **A failure to agree on the precise diagnosis of the cause of an impairment that presents a direct threat or causes an officer to be unable to meet the business necessity of his/her position is far less important than a finding that some impairment existed.** The Letter from Dr. Mar to Mr. Cline of 05/30/06 contained the statement that, "It is my opinion, the Officer Brownfield's behavior may be the result of untreated emotional consequences of his December 2000 accident that have been compounded by the intervening years by his inattention to possible treatment options as well as his persistently stubborn denial of such consequences". In the Letter from Dr. Mar of 08/03/06, Dr Marr observed (in testing and otherwise) that Officer Brownfield was impaired. He concluded that this is the result of untreated emotional issues. In the Psychiatric Evaluation FFD Follow-up of 08/14/06. Dr. Decker correctly pointed to Dr Mar's report as demonstrating the officer's Unfitness regardless of cause. Dr Decker made a good faith attempt to relate the reported deficits to damage to brain structures. In any case, Dr. Decker noted that she and Dr. Marr agree on many symptoms and traits, but differ only on causation. Officer Brownfield's behavior indicated problems that violate the principle of Business Necessity and he was Unfit.

15. **From the FFDE provider's viewpoint, claims of whistleblower retaliation are more credible when they occur before adverse actions are taken against the alleged whistleblower that after such the time when actions are taken.** The email from Brownfield to Copeland of 08/29/06 and the Mismanaged Funds Follow-up of 09/02/06 from Brownfield are the first mentions to which the reviewer is aware of a whistleblower claim. In an email from Brownfield to Zais 01/09/07, a mention is made of an alleged "physical threat history" of the chief. The email from Brownfield to Merryman of 01/28/07 revealed a communication regarding Brownfield's Texas "investigation" of the chief's alleged misconduct without any detail or evidence. By such time, the bases for the FFDE were well established.

16. **An arrangement for a second medical opinion, while not require, is a humane and appropriate action, but rejecting such action if it is properly administered within departmental regulations, is insubordination.** A letter of Capt. Copeland to Dr. Ekemo 01/11/07 arranged for a second opinion. This was followed by a Letter of Capt. Copeland to Dr. Decker 01/11/07 requesting a FFD re-evaluation. In an email from Brownfield to Copeland of 01/17/07, Officer Brownfield threats a malpractice suit against Dr Decker. In a letter from Mr. Zais to Brownfield of 01/23/07, Brownfield is noticed to submit to Dr. Ekemo's neuropsychological evaluation. In an email to Mabee from Brownfield of 02/02/07, Brownfield refused to submit to a FFDE in legal sounding language. In a letter from Zais to Brownfield of 02/07/07, the issue of possible insubordination is addressed. Officer Brownfield's email to Mabee of 02/12/07 was a legal sounding challenge to the city's position regarding FMLA and a challenge to Dr. Mar's "understanding" of Brownfield. It ended with a refusal to see Dr Ekemo as an improper referral. It made no mention of the Union Gap incident or the other

issues, such the mailed threat of harm to Dr. Thompson. Modification of Release and Waiver per Dr. Ekemo of 02/15/07 occurred when Brownfield attempted to alter documentation at the FFDE provider's office (most police psychologists interpret this action as a refusal to cooperate and withdraw participation in the assessment). Mr. Whitson informed Dr. Ekemo on 02/26/07 that Brownfield will not return for testing. A letter form Dr. Ekemo to Captain Copeland of 02/27/07 stated that Dr. Ekemo had attempted to provide the evaluation, but was unable and was notified that Brownfield would not return for completion. A Letter from Zais to Brownfield of 03/01/07 pointed to Brownfield's request to prove his fitness with an independent examination and how his refusal now seemed contradictory. It again orders him to report for evaluation.

17. **Further insubordination and misconduct after separation for departmental duties may be seen as evidence that an impaired mental state that had been associated with earlier misconduct is unresolved.** A letter from Mr. Zais to Brownfield of 02/01/07 has to do with the "bail bond incident at Union Gap" on 01/30/07. This incident appeared to be a blatant disregard of orders and would lead to immediate hearing for discharge regardless of medical status in some departments. The notes on the Pre-Termination Hearing appeared to indicate that Officer Brownfield was unresponsiveness, circumstantial and tangential. Officer Brownfield Email of 06/21/07 appeared to be a taunting and insubordinate document.

Question No. 1:

**Was Chief Granato justified in ordering Officer Brownfield to submit to a fitness for duty examination?**

As has been offered above as *Opinions*, it is my professional opinion that there were more than ample reasons for a chief to order an FFDE, or alternatively to proceed with a disciplinary action, in this case. The authority to insure that the mental and medical functioning of serving officers had been vested in regulation in the chief (Opinion 1) who had the positive responsibility to assure his department and community of the competent and appropriate conduct of his service officers. There was an established history of head injury that is both self-acknowledged and professionally identified and which had been documented (opinions 2, 3 and 4). There was documentation of irritable and emotionally disruptive conduct (Opinion 5) and documentation of insubordinate and bizarre, inappropriate and defiant conduct that could reasonably be though to be of psychological or medical origin (opinions 6, 7 and 8). The armed, minimally supervised officer admitted in administrative and legal settings or documents that he suffered forms of behavioral problems or was out of behavioral control at times (Opinion 9) and on one occasion, this loss of control may possibly have involved domestic violence (10). The officer required administrative intervention because of social conflicts and verbal altercations (Opinion 11). The officer uses the US Postal Service to make a written threat of bodily harm to a man that he suspects of having an intimate relationship with his

estranged wife (Opinion 12). The chief would have a duty to investigate such conduct or incidents and the FFDE is an appropriate methodology.

Question No. 2.

**Were all of the policies and procedures reasonably associated with the fitness for duty examination followed by Yakima?**

To the degree that I am aware of such policies and procedures that appeared to have been employed in this case, those used by YPD are frequently employed in my experience. The YPD appeared have used considerable restraint before requiring a FFDE (Opinions 1 through 12). The method of conducting the FFDE, which may vary from examiner to examiner, appeared to be of an acceptable sort (Opinion 13) and the participation of multiple examiners (Opinion 14) was an unusually liberal and conscientious method as compared with most departments with which I am familiar.

Question No. 3:

**Did the city of Yakima act reasonably to protect the privacy rights of the Officer during the fitness for duty process?**

To the degree that I am aware of the procedure, no obvious examples of privacy violations were noted. The inquiries into his relationship with his wife are requirements in most departments in such circumstances, especially given the consequences of a possible domestic violence challenge and the importance of the Lautenberg Amendment to the Gun Control Act of 1968.

Question No. 4:

**Was the city of Yakima justified in requiring Officer Brownfield to attend a 2nd fitness for duty examination with another medical care provider?**

I see no need for this second evaluation, except to establish a maximum confidence that the unfitness finding was the correct determination and as a humane procedure in that it offered an opportunity for the officer to defend and clarify his mental status yet again. It would appear that almost all examiners agreed that either Officer Brownfield as Unfit and required leave or was Unfit and required treatment, but no leave. It is my opinion that the FFDE is not a clinical psychology or psychiatric examination, but is a liability examination regarding the ability of an officer to perform her/her duty in a safe and effective manner (Opinion 14). The second examination appeared to be primarily motivated by diagnostic or causative differences, which should not be crucial to the fitness determination. The central issue is that an officer has shown insubordinate and disruptive and inappropriate conduct for some reason that was proximally caused by mental illness (Unfit) or for other reasons (Unsuitable but not for medical or psychological reasons). Every examiner seemed to agree on the former (Unfit) and disagree only about the precise reasons for the Unfitness. Even if there is a "non-brain

injury" explanation for Officer Brownfield's misconduct, there is still no scientific basis for the prediction of what may bring about a compete recovery within a certain time frame. The second evaluation may show that he is free from mental or medical illness, in which case I would recommend an administrative termination procedure (not medical) based on volitional misconduct. If the second assessment finding indicated some form of mental impairment (with or without brain injury) and there were professionals who believed that they could undertake treatment, the matter would fall to the officer to seek treatment and reapply for duty under a standard FFD Re-Evaluation protocol at that time he is released from treatment.

Question No. 5:

**Were these psychological conditions diagnosed by Dr. Decker a sufficient basis to keep Ofc. Brownfield on leave until he was fully evaluated and received clearance from a medical doctor to return to work?**

Dr Decker is a qualified mental health professional, physician and psychiatrist who had authored a learned tome on Fitness for Duty Evaluations. Dr Decker had made the determination that Officer Brownfield's conduct was sufficient to (as a professional matter) qualify him as Unfit, and that his history and observed behaviors indicated that the cause of the unfitness was a chronic injury to the centers of the brain that control personality. It is certain that other professionals may have differences with the later specific diagnosis, but few police psychologists would argue with the unfitness finding. However, I believe that there is a misplace confidence in the issue of diagnosis in this and all FFD cases (Opinion 14). What difference does it make if an officer is emotionally decontrolled, insubordinate, and disruptive because of an organic brain syndrome, a neurotic condition or another disorder? Unfit means that the officer's behavior is unacceptable because of reasons of direct threat or business necessity and he/she cannot continue as am armed, minimally supervised law enforcement officer. There is little doubt that the raw facts indicated that either Officer Brownfield was an impaired officer or an officer who repeatedly showed non-illness based misconduct and, therefore, medical leave is indicated until the officer is certified to return, retired or he as ordered to submit for administrative or disciplinary action following medical or psychological review.

Question No. 6:

**Did Officer Brownfield comply with the rules, policies, procedures, and directives of his employer related to the fitness for duty exam?**

**Were these rules and, policies, procedures and directives reasonable?**

To the degree that I am aware of the procedure and the subsequent events, he did not (Opinion 13, 14, 15, 16 and 17). There was a delay in obtaining Dr Gondo's records, resistance to submitting to examination in many ways and the assumption of an adversarial position that was incompatible with his claim of being mentally well. He was

repeatedly less than straightforward in acknowledging his misconduct (e.g. the issues with his wife and the threatening letter). The rules appeared to be reasonable.

Question No. 7:

**Was the medical information submitted by Ofc. Brownfield's doctors after Dr. Decker's initial determination that he was not fit for duty sufficient to require Chief Granato to reinstate Ofc. Brownfield to his duties as a police officer? This would include any information submitted by Dr. Mar, Dr. Drewe, Dr. Gondo, or any other medical care providers consulted by Ofc. Brownfield.**

**Was there any information in the testing or report of Dr. DeAndrea, who performed some neurological tests on Ofc. Brownfield as a part of Dr. Decker's fitness for duty examination, require Chief Granato to reinstate Ofc. Brownfield.**

I am unaware of any medical finding, before or following Dr. Decker's initial FFDE report, which would require the YPD to return Officer Brownfield to ordinary duty. Even the release for duty later communicated by Dr. Marr was conditional upon continued therapy. If any officer is fit to return to duty, why would he need continued therapy as a condition of release to duty? Therapy must be for some impairment? If the officer suffers an impairment that requires therapy, in what way would an examiner know when the impairment was sufficiently remedied for the officer to not longer "require therapy"? To allow an officer to return to a position in which he/she may reasonably be expected to make decisions and take actions that involve public safety and essential civil rights of suspects to go forward may be viewed as deliberate indifference to the welfare of the community and department, and its executives may be held liable if an adverse event were to occur. Only Dr Gondo opined that the officer was fit without conditions, and that seemed to be based upon his lack of MRI findings, and little else since he is not a psychiatrist or psychologist, nor does he have police examination credentials.

Question number 8:

**Did officer Brownfield's refusal to attend the 2nd fitness for duty examination violate any policies or procedures or practices of the Yakima Police Department? (Asked another way was Ofc. Brownfield insubordinate when he refused to attend the examinations of the 2nd fitness for duty examiner?)**

Assuming that the department had good standing (regulations, rules, procedures) to <u>require</u> a second evaluation, any refusal would be insubordination by definition. The materials at my disposal do not make this issue clear from the FFDE examiner viewpoint. What is clear is that Officer Brownfield was given repeated notices, warnings, opportunities and the like to reverse the finding of Dr. Decker's (and other's) reports and assumed an adversarial stance by refusing to cooperate with the 2ed FFDE and avail himself of yet another opportunity to establish that he was not impaired (Opinion 16).

Question No. 9:

P.14

**What Behaviors did Ofc. Brownfield exhibit before, during and after his termination that would affect his ability to do his job or to be fit for duty?**

Opinions 1-14 and 16 and 17 cover a full range of misconduct that is best characterized by the terms insubordinations, behavior unbecoming an officer, and defiance of orders, and well as a wide variety of emotional and mental incidents that can be considered to reasonably reflect the likelihood of mental or emotional impairment that may effect his effective operation as a police officer in the minds of behavioral professionals and as reason for employer concern and action.

Question number 10:

**What other opinions do you hold that have not been set forth above and that pertain too Officer Brownfield's fitness for duty and his termination?**

None.

(ii)    the data or other information considered by the witness in forming them;

Documents Notebook Index

Yakima PD Policy and Procedure Manual

Oral Interview for Police Officer.

Letter of Referral

An Oklahoma birth certificate for Officer Brownfield.

DD-214 (Military Discharge Certificate)

A Job Analysis/ Police Officer Description

The Original 1999 Application for Employment

Public Disclosure Statement in which he essentially denied a criminal background.

Standard Physical Fitness Report

Personal History Statement from 1999

Pre-Employment Background Investigation.

Psychological Report form Northwest Associates (dated Nov 15, 1999 and received Nov 17, 1999).

Policy and Procedure Exam and copy of Manual.

EEOC Regulations from 2000 in Internet format.

Case 2:08-cv-03005-RHW    Document 20-2    Filed 01/19/2009

11

Class Specification for Police Officer (YPD) Code 6121

Wage and Salary Verification for what appeared to be a disability insurance claim date 01/02/01

A FMLA Leave application date 01/03/01

It lists the expect return (to light duty) to be 3-6 months as the result of injuries from a MVA

An "Interconnect" Internet Article date 01/12/01

Standard Insurance Company Disability Claim Form dated 01/23/01

Standard Insurance Company Long-Term Disability Benefits Form dated 01/23/01

Employer Statement dated 05/14/01

A fragment of what appeared to be a Discharge summary (Page 4) form Providence Yakima Medical Center

Verification of eligibility for a City approved FMLA Leave (undated)

Letter to Officer Brownfield from City of Yakima date 02/28/01

Job Analysis of Non-Work related Injuries dated 03/13/01

Memo of 03/14/01 from Officer Brownfield to the Chief

FMLA Document dated 03/14/01

An "Interconnect" Internet Article date 04/09/01

Memo of 04/16/01 from Chief to Officer Brownfield

Standard Insurance Company Disability Claim Form dated 05/06/01 etc.

Neuropsychological Evaluation per Dr Richard Drew 07/06/01

Job Analysis of 07/07/01

Performance Evaluation of 01/23/02

Letter to the City of Yakima from the Trustee Corporation date 07/18/02

Performance Evaluation of 01/10/03

Job Analysis of 01/18/03

Memo of 12/01/03 from Sgt L. George

Performance Evaluation of 12/04/03

Neuropsychological Intake per Dr Richard Drew 01/02/04

Memo of 01/13/04 from Officer Brownfield to Chief Granato

Memo of 06/17/04 from Officer Brownfield to Sgt. Amos

Notes on DJ's Performance "memo"

Memo of 8/15/04 from Officer Brownfield to Sgt. Bardwell

Performance Evaluation (Undated)

Memo of 11/10/04 from Officer Brownfield to "Mike Amos" (no rank in title)

Memo of 05/04/05 from Officer Brownfield to Chief Granato

Second Memo of 05/04/05 from Officer Brownfield to Chief Granato

Memo of 05/06/05 from Lt. Merryman to Sgt Amos

Memo of 05/11/05 from Sgt Amos to Chief Granato

Personnel Complaint of 05/11/05

Memo of 05/12/05 from Lt. Merryman to Chief Granato

Memo of 05/18/05 from Officer Brownfield to Greg Copeland

Unheaded Report of the Internal Investigation (#05-14) interview regarding the Conference Room Incident of 5/11/05 that was conducted on 5/18/05

Undated letter to "Jenna" (maybe out of sequence)

Memo of 06/01/05 from Officer Brownfield to Greg Copeland

Detail Report per Lt Finch of 06/06/05

Detail Report per Capt. Copeland of 06/08/05

Supervisory Review (undated, but sometime in June).

The above was followed by a series of documents and regulation pages that pertain to this minimal punishment, including Chief Granato's memo of 06/27/08.

Memo of 06/30/05 from Capt. Copeland to Officer DeJournette (DJ).

Unheaded Report of the Internal Investigation (#05-14) interview that was conducted on 07/05/05

Unheaded note of 07/09/05

Detail Report per Capt. Copeland of 07/11/05

Memo of 07/28/05 from Chief Granato to Officer Brownfield

Memo of 08/03/05 from Sgt watts to Lt. Wentz (with last page missing)

Letter of 08/25/05 to Officer Lindgren

Dispute between female Officer Salinas note of 09/01/05

Detail Report per Lt. Foley of 09/21/05

Petition for Order for Protections of 09/19/05

Interviews regarding dispute between Officer Brownfield and female Officer Salinas note of 09/21/05

Memo of 09/28/05 from Capt. Copeland ordering a FFDE for Officer Brownfield

Memo of 09/28/05 from Sgt Stephens to Capt. Copeland

Detail Report per Capt. Copeland of 09/30/05

Unheaded Memo of 10/07/05 from Sophia Mabee to Capt. Copeland reporting that she was keeping Officer Brownfield's gun

Letter of 10/10/05 to Dr. Decker for Capt. Copeland

Letter to "Alex" at Bates page # 994 (Undated) but associated with an envelope with a cancellation date 10/19/05

Email memo from Officer Brownfield to Capt. Copeland of 11/03/05

Memo of 11/10/05 from Lt Foley to Captain Copeland

Letter from Dr. Decker to Capt. Copeland and Chief Granato of 11/11/05

Internal Investigation Summary (undated)

Letter of 12/01/05 (handwritten) from Dr. Decker to Dr. DeAndrea, neurologist

Letter of 12/01/05 Dr. DeAndrea to Dr. Decker (IME)

Detail Report per Lt. Foley of 12/05/05

Final Report: Unfit for Duty per Dr. Decker 12/12/05

Interview of Officer Brownfield of 12/17/05 (Date handwritten)

Memo of 01/01/05 from Officer Brownfield to Greg Copeland.

Letters of 01/05/06 and 01/12/06 from Chief Granato to Officer Brownfield

Quote for the IACP Guidelines for FFDE

Letters of 01/05/06 from Chief Granato to Officer Brownfield

Letters of 01/12/06 from Chief Granato to Officer Brownfield

Email of 01/18/06 to Jessica Stines

Letters of 02/01/06 from Chief Granato to Officer Brownfield

Physician initial report of 02/03/06.

Memo of 02/16/06 from s. Boyle to CPT. Light

P.18

Interoffice Memo of 02/21/06 per Capt. Copeland

Email from Officer Brownfield to Capt Copeland of 02/22/08

Response to Grievance Letter of 03/01/06 per Chief Ganado

Dr. Decker's Letter to Ms. Sophia Mabee (city attorney) or 03/15/06

Retuned Agreement Inquiry from Dr. Roy Gondo (Dr. Decker's letter of 03/28/06) with no date on return

Dr. Decker's Letter to Ms. Sophia Mabee (city attorney) or 03/30/06

Email series regarding Ms. Mabee and Mr. Cline 04/06-07/06

Dr. Decker's Letter to Ms. Sophia Mabee (city attorney) or 04/07/06

04/26/06 Report of Back Problems

Ms. Sophia Mabee Letter to Mr. Cline of 05/02/06

Dr. Bornfleth's Letter to Dr. Gondo of 05/15/06 confirming abnormal neurological status regarding spinal and other functioning.

Letter to Brownfield from Chief Granato and Capt. Copeland of 05/25/06

File memo of 05/25/06

Email from Brownfield to Cpt. Light of 05/25/06

Letter from Dr. Mar to Mr. Cline of 05/30/06.

Ms. Sophia Mabee Letter to Mr. Cline of 06/24/06.

Interoffice memo regarding the termination hearing per Capt. Copeland of 08/03/06

Letter from Dr. Mar of 08/03/06

Letter of Aug 3 2006 re-Hearing

Psychiatric Evaluation; FFD Follow-up of 08/14/06

Letter from Mr. Zais to Officer Brownfield of 08/22/06.

Email from Brownfield to Copeland of 08/29/06

Letter from Capt. Copeland to Officer Brownfield of 09/01/06.

Ms. Sophia Mabee Letter to Mr. Cline of 09/07/06

Captain Copeland's memo of 09/12/06

Mismanaged Funds Follow-up of 09/02/06(?) from Brownfield

The State EEOC Complaint.

Email to Chief Roger (?) 11/20/06

Email from Chief Roger (?) 12/19/06

City denies of FMLA leave for Brownfield of 12/21/06

Ms. Sophia Mabee Letter to Mr. Cline of 01/03/07

Letter from Chief Granato to Officer Brownfield of 01/05/07.

Email from Brownfield to Zais 01/09/07

Letter from Zais to Brownfield to 01/10/07

Letter of Capt. Copeland to Dr. Ekemo 01/11/07

Letter of Capt. Copeland to Dr. Decker 01/11/07

Email from Brownfield to Capt. Copeland of 01/17/07.

Letter from Mr. Zais to Brownfield of 01/23/07

Memo to file regarding Brownfield from Terry Greer

Email from Brownfield to Merryman of 01/28/07.

Letter from Mr. Zais to Brownfield of 02/01/07

Email to Sophia Mabee from Brownfield of 02/02/07

Letter form Lt. Foley to Capt. Copeland 0f 02/06/07

Letter from Mr. Zais to Brownfield of 02/07/07

Brownfield email to Mabee of 02/12/07

Modification of Release and Waiver per Dr. Ekemo of 02/15/07

Note from Brownfield (Undated)

One more communication with Chief Rogers in Texas.

Whitson to Dr. Ekemo of 02/26/07

Letter form Dr. Ekemo to Captain Copeland of 02/27/07

Letter from Mr. Zais to Brownfield of 03/01/07

Letter from Mabee to Whitson of 03/01/07

Letter from Zais to Brownfield of 03/05/07

Whitson letter to Mabee of 03/06/07

Extensive move to terminate letter for Zais to Brownfield of 03/08/07

P. 20

Undated email from Whitson to Brownfield

Notes on the Pre-Termination Hearing

Email of 06/21/07

Complaint of events of 06/16/07

(iii)   any exhibits that will be used to summarize or support them;

I do not intend to use any exhibits or summaries to explain my opinions.

**(iv) The witness's qualifications, including a list of all publications authored in the previous 10 years;**

My CV is attached.

(iv)   a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

I have not appeared as a witness or otherwise in a Police Psychology case in more than four years. My work is predominantly of a consulting and direct service nature (conduct FFDE for client agencies). I have appeared in several tort cases (mostly personal injury unrelated to law enforcement work) and my legal appearances and depositions have been limited to Central Louisiana District Courts in the last four years. If relevant, I can research the names associated with the appearances.

(v)   a statement of the compensation to be paid for the study and testimony in the case.

My standard and publishes charge for forensic work is $300/hour. To date, I have expended 41 Hours and the total charge is $ 12,300. If I testify, my changes are for total days away from my practice would be in the amount of $3000/ per day, to which is added expenses, such as airfare, airport parking, car rental, hotel and transfer costs, meals and other standard costs and charges.

_____
Cary D. Rostow, Ph.D., M.P.