Hon. Robert H. Whaley

1

2

3

LISH WHITSON PLLC
800 Fifth Avenue, Suite 4000
Seattle, WA 98104
(206) 892-2164

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| OSCAR J. BROWNFIELD, | No. CV-08-3005-RHW |
| Plaintiff, | PLAINTIFF'S CROSS-DESIGNATION OF DEPOSITION TESTIMONY AND OBJECTIONS TO DEFENDANT'S DESIGNATION OF DEPOSITION TESTIMONY |
| v. | |
| CITY OF YAKIMA, a Municipal Corporation, | |
| Defendant. | |

Plaintiff, by and through his attorneys of record, designates/cross-designates the following deposition testimony and objects to the following testimony designated by the defendant:

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTONS
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 1 of 7

*1*

| PLAINTIFF'S DESIGNATIONS RE: DEPONENT Norman Mar, Ph.D 2009 | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| | 6:14 | 9:20 |
| | 10:19 | 10:24 |
| | 12:21 | 13:16 |
| | 14:4 | 14:14 |
| | 15:24 | 16:2 |
| | 16:24 | 18:14 |
| | 35:14 | 36:14 |
| | 49:23 | 61:21 |
| | 62:4 | 62:11 |
| | 64:9 | 64:15 |
| **OBJECTIONS TO DEFENDANT'S DESIGNATIONS** | Beginning Page: Line | Ending Page: Line |
| Plaintiff renews objections made on the record. Plaintiff objects to the form of the question, it mischaracterizes | 30:13 | 31:6 |

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTIONS
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 2 of 7

2

| testimony. | | |
|---|---|---|
| Plaintiff renews objections made on the record. Plaintiff objects to the form of the question, it states facts that are not in evidence. Plaintiff also asserts an objection to foundation. | 45:19 | 47:9 |

| PLAINTIFF'S DESIGNATIONS RE: DEPONENT Richard Drew Ph.D February 20, 2009 | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| | 4:21 | 4:25 |
| | 15:23 | 16:24 |
| | 17:5 | 17:11 |
| | 19:2 | 20:12 |
| | 24:8 | 26:11 |
| | 51:7 | 53:17 |
| | 57:2 | 60:4 |

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTIONS
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 3 of 7

3

| OBJECTIONS TO DEFENDANT'S DESIGNATIONS | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| Lacks foundation and assumes facts not in evidence. | 9:19 | 9:24 |
| Lacks foundation and assumes facts not in evidence. | 33:3 | 33:9 |
| Lacks foundation and assumes facts not in evidence. | 35:6 | 35:10 |
| Lacks foundation and assumes facts not in evidence. | 41:19 | 43:3 |
| Lacks foundation and assumes facts not in evidence. | 44:10 | 44:20 |
| Lacks foundation and assumes facts not in evidence. | 44:21 | 45:20 |
| Lacks foundation and assumes facts not in evidence. | 50:1 | 51:1 |

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTIONS
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 4 of 7

4

| PLAINTIFF'S DESIGNATIONS RE: DEPONENT Robert Newell Ph.D March 20, 2009 | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| | 9:1 | 9:16 |
| | 12:8 | 17:19 |
| | 25:10 | 25:15 |
| | 29:3 | 31:11 |
| | 32:7 | 33:22 |
| **OBJECTIONS TO DEFENDANT'S DESIGNATIONS** | Beginning Page: Line | Ending Page: Line |
| Plaintiff objects to the form of the question as an imprecise and incorrect hypothetical. Plaintiff objects, question asked and answered. Plaintiff moves to strike. | 39:3 | 41:1 |

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTION
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 5 of 7

| | | |
|---|---|---|
| **PLAINTIFF OBJECTS TO ANY AND ALL DEPOSITION TESTIMONY OF Kathleen Decker, M.D.** The Defendant has failed to arrange a timely continuation of Dr. Decker's deposition. Plaintiff moves to strike any testimony of Dr. Decker in pleadings in support of Defendant's motion for summary judgment and at trial. | | |

Dated this 4th day of May, 2009.

By: s/ Lish Whitson
Lish Whitson, WSBA #5400

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTIONS
TO DEFENDANT'S DESIGNATION OF
DEPOSITION TESTIMONY - Page 6 of 7

6

1

2 <u>CERTIFICATE OF SERVICE</u>

3    I hereby certify that I electronically filed the foregoing with the Clerk of

4

5 the Court using the CM/ECF System which will send notification of such filing

6 to the following:

7    Jerry J. Moberg

8    jjmoberg@canfield-associates.com

9    Robert C. Tenney

10   tenney@mftlaw.com

11
Dated this 4th day of May, 2009 at Seattle, WA.
12

13                              By: <u>s/ Kristy L. Stell</u>
                                Kristy L. Stell, WSBA #39986
14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S CROSS-DESIGNATION OF
DEPOSITON TESTIMONY AND OBJECTIONS
TO DEFENDANT'S DESIGNATION OF          7
DEPOSITION TESTIMONY - Page 7 of 7

BROWNFIELD v. CITY OF YAKIMA          NORMAN MAR, 3/25/2009

## Page 29

1    aware of that?

2    A. I don't know if I was specifically aware of that,

3    no.

4    Q. But you were aware that he, in fact, did not get

5    treatment after January of 2001 for these emotional

6    problems?

7    A. Yes.

8    Q. And as I understand what you're saying in your

9    report, his failure to get treatment for these

10   emotional issues after his closed head injury

11   exacerbated or compounded his situation in August of

12   2006; is that true?

13   A. Yes.

14   Q. And you make a reference here, you say that "They

15   have been compounded by his inattention to possible

16   treatment options, as well as his persistently

17   stubborn denial of such consequences."

18       What did you mean by that? Persistently

19   stubborn denial of such consequences?

20   A. In my contact with Mr. Brownfield, he was very

21   consistent and very adamant about denying that his

22   emotional state would affect his functioning as a

23   police officer.

24   Q. I see. And was that stubborn denial or denial

25   clinically significant to you? I guess what I'm

## Page 30

1    trying to get at was that a function of his

2    psychological problems or was that just a refusal to

3    comply with -- with the doctor's orders, you see

4    what I'm saying?

5    A. I think it's part of it is his refusal to comply.

6    Which gets at his independence --

7    Q. I see.

8    A. -- and how strongly independent he is. And it also

9    gets to what I refer to in terms of his

10   inflexibility in wanting to see things the way that

11   he sees things and being resistant to suggestions

12   from other people.

13   Q. On the next page, third page of the report, in the

14   second to the last paragraph you say, "It is likely

15   given Officer Brownfield's current high level of

16   motivation for treatment, and given a very intensive

17   and aggressive course of treatment, that he will be

18   able to return to his full range of duties in about

19   three months."

20       Now, as I understand what you're saying is

21   that as of August 3rd, 2006 it was your opinion that

22   Mr. Brownfield was psychologically unfit for duty.

23   But that with an intensive course of treatment you

24   had hoped that he would become fit for duty, is that

25   basically what you're saying?

## 15 (Pages 29 to 30)

BROWNFIELD v. CITY OF YAKIMA          NORMAN MAR, 3/25/2009

## Page 31

1  A. Yes.

2      MR. BERGMANN: Object to the form of the

3  question, it mischaracterizes his testimony as

4  hopeful whether he states he will be able to return

5  to his former police duties in about three months.

6  Q. (By Mr. Moberg) Well, let's follow up on that.

7      As of August 3rd, 2006 was it your opinion

8  that if he went through a course of treatment he

9  certainly would then immediately following that

10  treatment be fit for duty?

11  A. Given a successful course of therapy and aggressive

12  treatment, yes.

13  Q. But that depended upon him following through with a

14  successful aggressive course of therapy?

15  A. Yes.

16  Q. And if he didn't follow through with a successful

17  course of aggressive therapy, then the contrary

18  would likely be true, that is, is he likely would

19  still remain unfit for duty?

20  A. Absent any change in his behavior. Absent a course

21  of treatment leading to a change in his attitudes

22  and behaviors, I don't believe he would be fit to

23  return to duty.

24  Q. And you weren't predicting the course -- let me

25  rephrase it.

## Page 32

1  A. Well, let's put it, let me put it this way, rather

2  than saying, in judging whether he is fit to return

3  to duty, ultimately that's the call of the Yakima

4  Police Department in terms of their needs for

5  individual officers.

6      But absent the aggressive course of treatment

7  or successful course of treatment, Mr. Brownfield

8  will continue -- would have continued to exhibit the

9  same kinds of behaviors and flaws in judgment that

10  are likely to interfere with Mr. Brownfield's

11  functioning as a police officer.

12  Q. And did you understand when Mr. Cline contacted you

13  that ultimately he wanted you to express an opinion

14  as to whether or not Mr. Brownfield was fit for

15  duty?

16  A. Would you say that again?

17  Q. Yes. Did you understand in your commission with Mr.

18  Cline when he hired you, that your task was to

19  determine whether Mr. Brownfield was fit for duty or

20  not?

21  A. Initially, my understanding was that Mr. Cline

22  wanted me to review the reports and the conclusions

23  contained in Dr. Decker's evaluation.

24  Q. Uh-huh.

25  A. And give my opinion about her opinion.

# 16 (Pages 31 to 32)

9

1c08e287-8735-41eb-9de3-15c2c7203bae

## Page 45

1    psychological services section. That is not true.

2    I don't know what the context of that contact has

3    been.

4    Q. Okay.

5    A. Officer Brownfield has gotten an idea in his head

6    that there are erroneous facts and these facts are

7    what led -- these individual facts are what led to

8    the conclusions in Dr. Decker's report and in my

9    report. That's just not true.

10   Q. Okay. And it is clinically significant because of

11   someone's personality problems that even when he is

12   told that's not true, he continues doggedly to

13   pursue it as if it is true?

14   A. Yes.

15   Q. That was one of the personality issues that you

16   noted in your evaluation and Dr. Decker noted in

17   hers?

18   A. It's what I noted in my evaluation.

19   Q. Okay. Were you aware that he rather doggedly and

20   persistently stalked Dr. Decker after her reports to

21   the point where she became concerned about her

22   personal safety?

23   A. No.

24       MR. BERGMANN: Object to the form of the

25   question as stating facts that are not in evidence.

## Page 46

1    Q. (By Mr. Moberg) Let me ask you to assume for the

2    sake of this question that after Dr. Decker's

3    reports and after you issued your reports, Mr.

4    Brownfield investigated Dr. Decker, including

5    contacting a police commander in Phoenix talking to

6    him over 30 minutes about Dr. Decker about

7    Mr. Brownfield's views that Dr. Decker was a, quote,

8    "hatchet man," closed quote.

9        That he wanted to know where Dr. Decker was

10   living, she had left Seattle. And that he then

11   proceeded to track down Dr. Decker and write her

12   E-mails accusing her of inaccurate reporting, and

13   threatening her with lawsuits. And that the police

14   commander was sufficiently concerned in his

15   conversation with Mr. Brownfield that he called

16   Dr. Decker and advised her that she should be

17   concerned about her safety.

18       Would those kinds of reactions on Mr.

19   Brownfield be consistent with the problems you were

20   seeing in August of 2006, which led to your

21   conclusion at that point that he was not fit for

22   duty?

23       MR. BERGMANN: Let me interpose an

24   objection as to the foundation. And the accuracy of

25   the statements made to the Phoenix police officer.

## 23 (Pages 45 to 46)

BROWNFIELD v. CITY OF YAKIMA                NORMAN MAR, 3/25/2009

## Page 47

1   Q. (By Mr. Moberg) Okay. You can still answer the
2       question.
3   A. The -- it's not behavior that I would have predicted
4       or foreseen from where he was in terms of my eval --
5       my letter of August, 2006. But there -- are there
6       elements that are consistent with the kind of
7       personality that I saw in my evaluation of Mr.
8       Brownfield? Yes.
9   Q. Did you get the sense in the Exhibit 125 that he was
10      either expressly or impliedly threatening to take
11      action against you because of your report?
12  A. I got the impression that yes, that he might also
13      want to file a complaint against me in some way.
14  Q. Okay. Were you aware at any time that he then did a
15      rather extensive investigation of your experience
16      and background?
17  A. Was I aware of that?
18  Q. Yes.
19  A. No.
20  Q. Were you aware that after your reports and after his
21      course of treatment with Dr. Newell, and at the
22      conclusion of all of his treatment, Dr. -- Chief
23      Granato sent him a notice advising him that
24      basically he had reports that Mr. Brownfield was
25      unfit for duty and was -- and could be terminated

## Page 48

1   and wanted to set up a pretermination hearing?
2       And that following receiving that notice from
3       Chief Granato, Jeff Brownfield did an extensive
4       background investigation into Chief Granato's prior
5       employment in Kingsville, Texas?
6   A. I was not aware of that.
7   Q. Okay. Assuming that to be true, and assuming that
8       the investigation included contacting a number of,
9       two or three people who were detractors from Chief
10      Granato, and he even got on a blogging website and
11      tried to seek information of a negative nature of
12      Chief Granato when he was employed at Kingsville,
13      would those kind of behaviors be clinically
14      significant to you in your feeling about Mr.
15      Brownfield's psychological fitness for duty?
16  A. That kind of behavior would cause me concern about
17      any person.
18  Q. Why?
19  A. It seems overdetermined. And intrusive.
20  Q. Would it --
21  A. I'm not sure what you are asking.
22  Q. Well, would it cause you concern about his -- would
23      it cause you any concern about whether or not Mr.
24      Brownfield had made the progress you had hoped for
25      in psychological treatment if his behaviors after

## 24 (Pages 47 to 48)

1c08e287-8735-41eb-9de3-15c2c7203bae

```
 1       diagnose and treat conditions which might outwardly
 2       show in some kind of psychological manifestation but
 3       have some brain related or organic cause or source;
 4       is that fair to say?
 5   A.  You're saying that you would treat people that
 6       wouldn't necessarily show brain impairment?
 7   Q.  No, no, actually I'm trying to express, let me see
 8       if I can retry that.
 9   A.  Okay.
10   Q.  Because I'm trying to get an idea of the difference
11       between somebody who's a psychologist and somebody
12       who's a neuropsychologist.
13           Do I understand that in the specialty of
14       neuropsychology you're specially trained to relate
15       psychological behaviors or misbehaviors to organic
16       brain functions or dysfunctions?
17   A.  You're trained to relate behavior to brain function,
18       yes.
19   Q.  Whereas somebody just trained in psychology while
20       they may see, observe and treat the psychological
21       manifestation they may not have the discipline or
22       training to relate that back to an organic brain
23       injury or a brain dysfunction?
24   A.  That's correct.
25   Q.  All right.  You provided me three files to look at,
```

BROWNFIELD v. CITY OF YAKIMA                    RICHARD DREW, 4/20/2009

```
 1        some therapy regarding head injury.  He didn't want

 2        to do it.  He just wanted to go back to work.

 3   Q.   Okay.  And when you're talking to him about the

 4        emotional sequela, this is the same concerns you had

 5        in your first visit that there would be some

 6        emotional problems that would likely show up as a

 7        result of the particular head injury he had in his

 8        later life?

 9   A.   That's correct.

10   Q.   All right.  And apparently you said that he didn't

11        want to have anything to do with it.  Did he say he

12        was not going to follow that recommendation, wasn't

13        going to get psychological help?

14   A.   I think he said he would not follow up, that he

15        wanted to go to work.

16   Q.   All right.  Let me ask you two other questions then.

17              At that point then, having completed this

18        evaluation, what functional issues would you expect

19        he would have based on the visual problems that you

20        had, visual-spatial problems that you had diagnosed?

21   A.   I don't know if I'd say I would expect him to have,

22        I'll tell you what my concerns were.

23   Q.   What were your concerns?

24   A.   That he might miss visual detail in a situation.

25        Say he's in a situation with cars and people and
```

BROWNFIELD v. CITY OF YAKIMA          RICHARD DREW, 4/20/2009

```
 1     problems were.  And he had accepted them.  And so he

 2     knew about them.  This was not a brain impairment

 3     that prevented him from -- from understanding his

 4     deficits.  He simply wasn't aware of them until he

 5     was taught and then he did learn and adapt.

 6  Q. And would you be concerned that he might have some

 7     level of denial about those limitations and

 8     therefore, not seek appropriate treatment or report

 9     appropriate concern?

10  A. That's what I felt was going on.

11  Q. Okay.  Did you provide any treatment for him after

12     that evaluation?  And before we go there let me ask

13     you one other question I neglected to ask.

14         At the end of that evaluation, you recommended

15     to him that he have some course of psychological

16     treatment; is that correct?

17  A. That's correct.

18  Q. Which he rejected and said he wasn't interested in,

19     correct?

20  A. Correct.

21  Q. Did you recommend any other form or course of

22     treatment for him at that time?

23  A. Yes.  I recommended a more complete visual

24     evaluation.

25  Q. Okay.
```

1    things and ways to adjust to them.  I think -- a big

2    part of my job at this stage is education so they

3    understand what's going on and what's the reasons

4    for these things.  Some of the things that trigger

5    the frustration and impatience and, you know, those

6    kinds of things.  So there was a lot of that went

7    on, I'm sure.

8         But it's just a teaching process.

9    Q.  Now, he had reported to you that he had what

10   appeared to me sort of passive moments and then he

11   would be given to angry outbursts.

12        Is that reported to you -- first of all, is

13   that accurate, is that what he reported to you?

14   A.  Yes.

15   Q.  Is that something that you would reasonably

16   associate with the emotional fallout from the kind

17   of brain injury that he suffered?

18   A.  Yes.

19   Q.  All right.  And how do you treat that passivity and

20   then angry outbursts from a psychological

21   standpoint?

22   A.  Well, a lot of ways depending on the circumstances.

23   One of the things that happens fairly consistently

24   with head injured people that don't get treatment,

25   is that their self-confidence just goes all to pot.

15

1      Because they're making mistakes they don't know

2      they're going to make, they don't anticipate them

3      and they keep making them over and over again.  They

4      aren't capable of doing all the things they were

5      before, they're generally very frustrated and I

6      think probably the basic emotion is that they're

7      scared.  When your brain doesn't do what you expect

8      it to, it's pretty scary.

9           We talk about the source of the problem, we

10     usually talk about, okay, what things are you

11     comfortable sharing and doing together, what things

12     can he pick up and that sort of thing.  But we talk

13     a lot about how to avoid problem areas.  Fatigue is

14     one of the problem areas.  Being overwhelmed by

15     stimulus, you know, the dog barking and the kids

16     running around and your wife arguing with you at the

17     same, it isn't going to work.

18          So there's certain things that you can do and

19     be aware of to try and reduce the incidence of the

20     frustration.  But lack of confidence was something

21     that he really identified with, I remember that.

22     And she did, too.  And he is in my opinion at that

23     point he's such a competitive person that he

24     didn't -- he didn't want to give up anything.  And

25     part of his big measure of himself is his physical

1          abilities, which he was very focused on and those

2          were compromised because of his left side weakness

3          and so forth.  So he was having a really tough time.

4    Q.   How about in areas of judgment?  Would you expect --

5          did you either observe or expect that he would be

6          suffering from any limitations in exercising good

7          judgment?

8    A.   Judgment's difficult to evaluate unless it's

9          blatantly off.  I did not see things that I thought

10         indicated real poor judgment.  But I had the reports

11         of him blowing up and pulling his wife's hair.  And

12         certainly I'm very concerned about it in his line of

13         work where judgment is so critical.

14   Q.   Okay.  And did you recommend a further course of

15         treatment to --

16   A.   I did.

17   Q.   And what was your recommendation?

18   A.   That he continue with some individual therapy and

19         therapy with his wife with him.  So we could get to

20         the bottom of some of these things and try and make

21         some modifications.

22   Q.   At the point you made that recommendation were you

23         able to determine the length and time of the course

24         of this treatment or was it open ended?

25   A.   At some point I did do an individual on a time

1        frame.

2            Yeah, here it is on the notes from the

3        individual therapy sessions.  "He utilizes

4        strategies well and is believed that two to

5        three months program of individual and/or group

6        therapy on a weekly basis would be adequate."

7   Q.   Do you know whether or not he followed that

8        recommendation?

9   A.   He did not.

10  Q.   And these emotional as you call them sequelae and

11       sometimes people get confused with that word and I

12       refer to it as fallout.  In other words, the

13       emotional reactions that he's going to have where

14       you might reasonably expect he would have from this

15       brain injury.  If they are untreated will they stay

16       the same, get better or get worse?

17  A.   As a general thing I think they get worse until the

18       patient gets some insight into them and sometimes

19       they stay worse.  Certainly sometimes they get

20       better, too, they learn.

21  Q.   Okay.  With Mr. Brownfield, after you made this

22       recommendation, would you be surprised to find out

23       that after July 4th of 2000, or July 2nd of 2004,

24       that he continued to have difficulties getting along

25       with his wife, difficulties getting along in work,

18

Page 45

1      blowing up at supervisors, and expressing issues

2      around frustration, depression and inability to

3      function?

4            MR. BERGMANN:  Let me just interpose an

5      objection to the form of the question.  Assumes

6      facts not in evidence.

7  Q.  (By Mr. Moberg) And the question isn't suggesting

8      that he had all those, but would you expect that

9      those kind -- let me rephrase it.

10     For example, untreated as Mr. Brownfield did

11     not follow your course, would you be surprised to

12     learn that in his work environment he was not

13     getting along with his supervisors, he was blowing

14     up at his supervisors, swearing at them and doing

15     things like that in his work?

16  A.  I would not be surprised, but I have to tell you

17     that he called me and told me all of those things

18     were going on.

19  Q.  Oh, I see.

20  A.  At a later time.

21  Q.  Well, when did you see him next then after the last

22     session where you treated him?

23  A.  Yeah, I didn't see him.  He came into the office, he

24     left a note to me and a -- two evals by Dr. Decker.

25  Q.  And when did he deliver that note to you, if you

19

BROWNFIELD v. CITY OF YAKIMA                    RICHARD DREW, 4/20/2009

Page 50

```
 1   Q.   His wife had reported on more than one occasion
 2        something to the effect that she felt she had lost
 3        her husband after the 2000 accident.  She indicated
 4        that she had noticed increase in his defiance, angry
 5        outbursts, impulsivity, those sorts of things, and
 6        that was what she was referring to.
 7             First of all, when you saw her did she ever
 8        make an expression like that to you?
 9   A.   I don't recall.  I hear that very, very often in
10        cases like this.  So I don't recall, I didn't make a
11        note of it.
12   Q.   What's the significance of that comment by his wife,
13        if any?
14   A.   Well, people change when their brain changes.  If
15        there's organic impairment there's a change usually,
16        it doesn't always manifest itself in the
17        personality, but it often does.  And he reacts to
18        things differently, I think is what she's saying
19        than he used to.  She can't count on him being the
20        person he was before.  Usually, you have to relearn
21        how to interact with them to be effective and not
22        trigger these things, if that's possible.
23             There's just a whole series of things that
24        happen.  But that's the bottom line that I hear
25        many, many times from family members.
```

20

BROWNFIELD v. CITY OF YAKIMA                RICHARD DREW, 4/20/2009

 1    Q.   Okay.

 2                   MR. MOBERG:   Thank you.   Those are all

 3         the questions I have.

 4

 5                        EXAMINATION

 6         BY MR. BERGMANN:

 7    Q.   You only met his wife on the one occasion; is that

 8         correct?

 9    A.   I'm sure I met her at the hospital also.

10    Q.   Yeah.

11    A.   I only saw her in therapy one occasion.

12    Q.   And that was in early 2004?   January of 2004, I

13         think?

14    A.   I think that's right.   Yes.

15    Q.   January 21st, right?

16    A.   Right.

17    Q.   You wouldn't be surprised to find, would you, that

18         in every marriage that ends up in a divorce that

19         there's usually two sides to the story, right?

20    A.   That's correct.

21    Q.   Would you be surprised to find that Jeff is now

22         happily married?

23    A.   I don't know what's going on with Jeff, I haven't --

24         it's been a long time since I've had contact.

25    Q.   Okay.   I'll ask you to assume that he is happily

BROWNFIELD v. CITY OF YAKIMA    ROBERT NEWELL, 3/20/2009

Page 39

1    A.    No, that is the only document authored by Dr. Drew

2          that's contained in my file.

3    Q.    All right.  Just so I'm clear on this.  I want you

4          to assume for the sake of this question that

5          following his December 2000 motor vehicle accident,

6          Mr. Brownfield was treated and assessed in the time

7          frame from December of -- actually, January of '01

8          through July of '01, by Dr. Drew, the

9          neuropsychologist.

10              Dr. Drew expressed -- was of the opinion and

11         expressed to Mr. Brownfield that he believed that as

12         a result of his closed head injury he would have

13         some significant, as he referred to it, emotional

14         sequelae which related to the injury.  Which

15         included such things as impulsivity, issues related

16         to getting along with others, and actually some of

17         the issues that he identified in his '04 report.

18              Given your treatment and assessment, are you

19         in a position to quarrel with or disagree with Dr.

20         Drew's assessment in any regard?

21              MR. WHITSON:  Objection, imprecise and

22         incorrect hypothetical, move to strike.

23   Q.    (By Mr. Moberg) You can still answer.

24   A.    The answer is no, my focus was different.  First of

25         all, I'm not trained as a neuropsychologist, so

BROWNFIELD v. CITY OF YAKIMA    ROBERT NEWELL, 3/20/2009

Page 40

1    that's outside of the scope of my practice, and I'm
2    not qualified to weigh in on those factors.
3         You know, when a patient brings me
4    information, regardless of the source, I mean,
5    certainly I pay attention to lots of previous
6    psychological evaluations.  But an individual
7    psychological functioning is not a static thing
8    necessarily.  And, you know, people change over
9    time, they can improve, they can -- they can --
10   what's called decompensate, get worse.
11        So it's Dr. Drew's findings -- well, the only
12   report I reviewed was the 2004 report, weren't --
13   although they would have been something I would have
14   considered, I would have been more focused on what I
15   observed from Mr. Brownfield.
16  Q. And I understand that, I just want to make sure that
17      you're not telling me that you're expressing an
18      opinion as to whether, in fact, his personality
19      issues you treated were or were not causally
20      relating to the motor vehicle accident of 2000; is
21      that a correct statement?
22              MR. WHITSON:  Objection, asked and
23      answered.
24  A. Correct, I do not have an opinion as to the extent
25      to which any of Mr. Brownfield's behavior is the

23

b3d0e6aa-3492-4bc4-9d42-46a7e9636d34

BROWNFIELD v. CITY OF YAKIMA     ROBERT NEWELL, 3/20/2009

Page 41

1     product of a traumatic brain injury.

2   Q.  (By Mr. Moberg) All right.  Now, I'm going back to

3     Exhibit 103.  One of the questions that was asked

4     was -- well, I'm not sure this was in response to a

5     question.  But the bottom of page 1 of Exhibit 103,

6     you make the statement, "My evaluation of Mr.

7     Brownfield was not for the purpose of," I think it

8     says, "determining employment suitability or

9     ability."

10      Did I read that correctly at the very bottom?

11  A.  Okay.  My evaluation of Mr. Brownfield was not for

12     the purpose of determining employment suitability or

13     ability, yes, that's correct.

14  Q.  And that's correct.  When you were treating him for

15     those conditions, it was not for the purpose of

16     determining whether he was, wasn't or would be

17     suitable to act as a police officer in the future?

18  A.  Or any other job.

19  Q.  All right.

20  A.  That's correct.

21  Q.  All right.  And in this document, one of the

22     questions asked was whether or not or was asking you

23     to certify that Mr. Brownfield was unable to work

24     without serious risk -- well, let me read it, it

25     says, 5, "I certify that the above individual was

24

b3d0e6aa-3492-4bc4-9d42-46a7e9636d34