1
2
3
4
5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7

OSCAR J. BROWNFIELD,

8

Plaintiff,

NO.  CV-08-3005-RHW

9

v.

10

CITY OF YAKIMA, a municipal
corporation,

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

11
12

Defendant,

13

Before the Court is Defendant's Motion for Summary Judgment (Ct. Rec.

14

31). A hearing on this motion was held on May 8, 2009. Plaintiff was represented

15

by John G. Bergmann, Lish Whitson, Kristy Stell, and David Brown; Defendant

16

was represented by Jerry Moberg.

17

### FACTS

18

The following facts are undisputed unless otherwise noted.

19

*Plaintiff's Employment and Termination*

20

Defendant hired Plaintiff as a police officer on November 15, 1999. In 2000,

21

Plaintiff was in a serious off-duty automobile accident in which he suffered a

22

closed head injury and reported a brief loss of consciousness. He returned to light

23

duty at the police department in March 2001 and full duty in July 2001. During his

24

recovery, Plaintiff was examined by a neuropsychologist, Richard H. Drew, Ph.D.,

25

on at least three occasions. On July 6, 2001, Dr. Drew reported that Plaintiff was

26

"recovering nicely" from his accident and showed only minor physical and visual

27
28

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT * 1**

residuals of the closed head injury (Dep. Ex. 3, p. 2). Dr. Drew also noted: "It is not believed Mr. Brownfield is going to have any problems returning to work, however, there is no testing available that taps into the intense situation that can develop in the daily work of an officer of the law. Only observation on the job can accurately assess his abilities and judgment under those stressful conditions." (Dep. Ex. 3, p. 3).

By all accounts, Plaintiff's job performance for the first few years after his return to work was exemplary. His performance reviews from November 1, 2000, through October 31, 2004, were above average, and Plaintiff received numerous commendations and positive remarks. In late 2002, Plaintiff was assigned to the Community Service division, where he researched and helped to develop the Yakima Police Athletic League (YPAL), which received significant grants and donations.

However, Plaintiff contacted Dr. Drew again in January of 2004, "reporting significant difficulty getting along at work, at home, and with himself." (Dep. Ex. 4, p. 1). Dr. Drew considered Plaintiff's symptoms of reduced self-confidence and frustration to be "consistent with what we see quite often with untreated emotional sequela of a closed head injury," and recommended individual and group therapy on a periodic basis. (Dep. Ex. 4, p. 1-2). Defendant was unaware that Plaintiff had sought treatment from Dr. Drew.

On June 17, 2004, Plaintiff wrote a memo to his immediate superior, Sgt. Amos, with the subject line "Unethical work practices," summarizing a meeting Plaintiff had with Sgt. Amos on June 10, 2004. (Dep. Ex. 5). Plaintiff expressed concerns that his community service partner, Ofc. Dejournette, was utilizing too much overtime and spending too much time on his old fraud cases. Plaintiff also expressed a concern that Ofc. Dejournette had not been reprimanded because of his

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 2

close relationship with their supervisor, Lt. Merryman. Over the rest of 2004 and early 2005, Plaintiff compiled notes chronicling his various concerns with Lt. Merryman's work performance. He also sent another memo on August 15, 2004, to a Sgt. Bardwell, reporting concerns with Ofc. Dejournette's handling of his fraud cases. (Dep. Ex. 6).

In 2005, Chief of Police Sam Granato asked Lt. Merryman to organize some representation from the police department at a Cinco de Mayo festival. This duty was eventually delegated to Plaintiff and Ofc. Dejournette, who did not accomplish the task to Chief Granato's satisfaction. Lt. Merryman eventually verbally reprimanded both officers for their roles in the "untimely and unorganized" events. (Dep. Ex. 8).

After receiving this reprimand, Plaintiff sent Chief Granato two emails, forwarding his memos from June and August 2004 and the notes he had compiled regarding Ofc. Dejournette's performance. (Dep. Ex. 7). Plaintiff also expressed a concern that Lt. Merryman may have been conducting an internal investigation on Plaintiff without his knowledge.

On May 10, 2005, Plaintiff and Lt. Merryman exchanged emails about Plaintiff's concerns with the YPAL unit and Ofc. Dejournette's performance. (Moberg Decl., Ex. H., batestamped pp. 676-680). That same day, Plaintiff and his union representative, Sgt. Hester, met with Sgt. Amos to discuss Plaintiff's concerns with Lt. Merryman. Plaintiff asked Sgt. Amos to set up a meeting with Chief Granato so that Plaintiff could express his concerns directly to the Chief. Sgt. Amos said that he would do so. (Moberg Decl., Ex. H., bates p. 681).

On May 11, 2005, Plaintiff was called into a meeting with Lt. Merryman and Sgt. Amos to discuss his emails of the previous day. Plaintiff believed that he would be meeting directly with Chief Granato and did not expect Lt. Merryman to

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 3

be present. During the meeting, Plaintiff became upset and left the room, disregarding Lt. Merryman's order to return to the meeting and sit down. Plaintiff then contacted his on-duty union representative, Ofc. Fowler. Ofc. Fowler agreed to speak to Plaintiff outside of Lt. Merryman's presence and then return with Plaintiff to the meeting with Lt. Merryman and Sgt. Amos. (Dep. Ex. 9, pp. 27-28). At some point, Sgt. Amos sought out Plaintiff to order him to return to the meeting, and found him in conversation with Ofc. Fowler in the muster room. Upon seeing Sgt. Amos, Plaintiff pointed at Sgt. Amos and said, "You f--ked me, so just get the f--k out of here." (Moberg Decl., Ex. H., bates p. 681; Dep. Ex. 9, p. 29). Sgt. Amos left; Lt. Merryman later found Plaintiff and suspended him for 24 hours.

On May 12, 2005, Plaintiff met with a Capt. Copeland to discuss his concerns about Ofc. Dejournette, Lt. Merryman, and the YPAL program. Plaintiff repeated the allegations he expressed in his memoranda, added that he was concerned about YPAL's financial records, and recommended that an outside auditor review those records. After conducting an internal investigation, Capt. Copeland concluded on June 8, 2005, that Plaintiff's allegations were largely unfounded, and that in fact Plaintiff had been taking more overtime than Ofc. Dejournette. (Dep. Ex. 28). However, Capt. Copeland did agree that Ofc. Dejournette had some performance issues, and he also recommended that an outside audit of YPAL's books be conducted.

The department conducted an internal investigation of the incident that occurred on May 11, 2005, between Plaintiff, Lt. Merryman, and Sgt. Amos. During a taped interview on May 18, 2005, Plaintiff reported that he left the meeting because, "I was starting to get agitated. Because of my training with D.A.R.E. and with some of my medical stuff that I've gone through, ah, after my wreck, I know that I'm agitated and some of the suggestions to me over time has

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 4

1   been once you reach this level of agitation, you need to take a break." (Dep. Ex. 9,

2   p. 23). Plaintiff reported that he was "consumed" with fear and anger, felt like a

3   "caged animal," and was crying when he left the meeting. (Dep. Ex. 9, pp. 23, 32).

4   Plaintiff was eventually disciplined for his insubordination and verbal abuse, losing

5   24 hours of accrued time. (Moberg Decl., Ex. H., bates pp. 845-48).

6        On September 1, 2005, Plaintiff had a verbal encounter with a female

7   officer, Ofc. Salinas, during muster. A Sgt. Watts eventually broke up the dispute

8   and verbally reprimanded both officers. On September 15, 2005, Chief Granato

9   ordered Capt. Copeland to conduct an internal investigation into Plaintiff's

10  allegedly harassing conduct in the encounter. No investigation of Ofc. Salinas's

11  conduct was ordered. When Sgt. Watts informed Plaintiff of the investigation, he

12  became "very upset" and had difficulty speaking in full sentences. (Moberg Decl.,

13  Ex. H., bates p. 910). Concerned about whether Plaintiff would be able to perform

14  his duties that day, Sgt. Watts met with Plaintiff and a union representative. During

15  that meeting, Plaintiff was "very upset, very agitated" and declared, "you know

16  how flustered I get when I'm upset. And I just need someone here to keep me

17  calm." (Moberg Decl., Ex. H., bates p. 910). Plaintiff returned to work that day,

18  and Capt. Copeland eventually determined that the allegation of harassment was

19  unfounded and that both officers contributed to the escalation of the argument.

20  (Bergmann Decl. Ex. 11, bates 958-60).

21       On September 11, 2005, Sgt. Watts prepared a memo summarizing

22  Plaintiff's account of a call he had been on in late August during which he stopped

23  a vehicle because he believed the vehicle's passenger may have been a wanted

24  felon. (Moberg Decl., Ex. H., bates 880). Sgt. Watts reported that Plaintiff had

25  become upset after a young child had said "rude things" to him, his leg started to

26  shake, and he "wasn't sure what he was going to do, so he called for assistance

27

28  **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
    JUDGMENT** * 5

from other officers." (Moberg Decl., Ex. H., bates 880). Sgt. Watts questioned Plaintiff's judgment in asking for backup.

The officer who responded to the call, Sgt. Stephens, submitted a more detailed account of the incident to Capt. Copeland on September 30, 2005. (Moberg Decl., Ex. H., bates 956-57). Sgt. Stephens reported that when he arrived, four adult men were yelling at Plaintiff, and several other individuals present (including a small child about 12 years old) were complaining that Plaintiff was being aggressive towards them. When one adult male insinuated he could "take" Plaintiff, Plaintiff "walked towards him and told him that he would flatten him if the subject got any more aggressive with him." Plaintiff's arm and leg were shaking during the encounter. Plaintiff and Sgt. Stephens released the driver and passenger after determining the passenger was not the wanted suspect.

On September 18, 2005, a Lt. Foley responded to a call from Plaintiff's ex-wife, Leticia Brownfield, alleging domestic assault. (Moberg Decl., Ex. H., bates 883-85). Ms. Brownfield reported that she had walked into Plaintiff's apartment and witnessed Plaintiff's girlfriend there with Plaintiff's and Ms. Brownfield's children. Ms. Brownfield reported that Plaintiff slammed the door on her as she was leaving. After determining that Ms. Brownfield had no visible marks or injuries, and interviewing Plaintiff, Lt. Foley determined there was no probable cause to arrest.[1]

---

[1] Also on September 18, 2005, Plaintiff filed a petition for a restraining order against Ms. Brownfield. (Dep. Ex. 12). In the petition, he wrote, "Because of a severe head injury due to an auto accident, I suffer from emotional impulsivity." Although Defendant offers this as more evidence of Plaintiff's unfitness for duty, it is not clear from the record when any member of the police department learned of

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT * 6**

1  As part of his investigation into the encounter with Ofc. Salinas, Capt.
2  Copeland interviewed Plaintiff with a union representative present on September
3  21, 2005. During that interview, Capt. Copeland "tried to tell [Plaintiff] that my
4  impression was that he was under a lot of stress and I tried to get him to seek
5  professional help." (Copeland Dep., p. 55). The union representative, Ofc. Fowler,
6  echoed these sentiments, to which Plaintiff responded angrily. Ofc. Fowler later
7  reported to Capt. Copeland that, after the interview, Plaintiff "blew up and cursed
8  at" Ofc. Fowler for not representing him well during the interview. (Copeland
9  Dep., p. 55).

10  On September 28, 2005, an officer who worked on the same squad with
11  Plaintiff reported to Capt. Copeland that the officer was concerned about Plaintiff's
12  emotional state and believed Plaintiff needed professional counseling. (Dep. Ex.
13  35; Brownfield Decl., Ex. 3). According to Capt. Copeland, the officer reported
14  that Plaintiff had made "'hopeless'-sounding statements"(Dep. Ex. 35).  In 2007,
15  the officer wrote in an email that he had "no specific memory of using the single
16  word "'hopeless'" in describing Plaintiff's statements, and also stated his opinion
17  that Plaintiff's past issues seemed to have been resolved. (Brownfield Decl., Ex. 3).

18  Also on September 28, 2005, Capt. Copeland notified Plaintiff that he had
19  been referred for a fitness for duty evaluation (FFDE) with Dr. Kathleen Decker on
20  October 12, 2005, and would be placed on paid administrative leave pending the
21  evaluation. (Dep. Ex. 113). In a memorandum to Dr. Decker, Capt. Copeland
22  summarized Plaintiff's history with the department and offered the following
23  reasons for the FFDE:

24      (1)    Plaintiff's conduct during the meeting with Lt. Merryman and Sgt.
25             Amos that led to an internal investigation and disciplinary action;
26  ─────────────────────
    the contents of this petition.
27
    **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
28  **JUDGMENT** * 7

(2)   Plaintiff's report of memory problems, which had been caused by medication Plaintiff took as a result of his accident, and which had resolved after he stopped taking that medication;

(3)   Plaintiff's contested divorce and the calls to law enforcement made by Plaintiff and his ex-wife;

(4)   The incident with Ofc. Salinas and Plaintiff's conduct during the investigation of that incident;

(5)   Plaintiff's "strange reaction" during the traffic stop in August 2005;

(6)   The report of "'hopeless'-sounding statements" Capt. Copeland received from Plaintiff's fellow officer;

(7)   Generalized concerns that Plaintiff "seems to lose his temper easily" and may not be fit to contact citizens and deal with other officers;

(8)   Concerns about possible continuing effects of Plaintiff's automobile accident in 2000; and

(9)   Plaintiff's involvement in mixed martial arts competition, which Capt. Copeland considered possibly "risk-taking behavior."

(Dep. Ex. 35).

On October 19, 2005, Plaintiff saw Dr. Decker for the initial part of his FFDE. Dr. Decker arrived at a preliminary diagnosis,[2] but referred Plaintiff to a forensic neurologist, Dr. DeAndrea, for additional testing. (Dep. Ex. 43). On December 1, 2005, on his way to visit Dr. DeAndrea, Plaintiff was involved in an automobile accident. (Moberg Decl., Ex. H, bates 1138). Plaintiff sustained some minor physical injuries and received treatment from his primary care physician.

On November 10, 2005, Lt. Foley sent a memorandum to Capt. Copeland

---

[2] Dr. Decker's initial report, dated November 11, 2005, does not appear in the record.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 8

1    detailing contacts he had had with Leticia Brownfield and one of her employers,

2    Dr. Alex Gabriel. (Moberg Decl., Ex. H, bates 1001-03). Ms. Brownfield had

3    contacted Lt. Foley to express her concerns over Plaintiff's alleged violations of a

4    mutual anti-harassment order. Ms. Brownfield played Lt. Foley two voicemail

5    messages Plaintiff had left for her, one of which Lt. Foley described as a "string of

6    vulgar name-calling." (Moberg Decl., Ex. H, bates 1002). Lt. Foley reported that

7    he heard "no direct or implied threats." (Moberg Decl., Ex. H, bates 1002). Dr.

8    Gabriel showed Lt. Foley a letter he had received from Plaintiff, in which Plaintiff

9    threatened to "hurt" another physician that employed Ms. Brownfield. (Moberg

10   Decl., Ex. H, bates 1003; the letter itself is Dep. Ex. 37).

11       After receiving Dr. DeAndrea's assessment, Dr. Decker issued a final report

12   on December 12, 2005, opining that Plaintiff was permanently unfit for duty due to

13   emotional sequelae stemming from his accident in 2000. (Dep. Ex. 43). Dr. Decker

14   reported that Plaintiff demonstrated "poor judgment, emotional volatility and

15   irritability" that were "unlikely to improve with treatment." (Dep. Ex. 43). Dr.

16   Decker concluded that because Plaintiff's residual symptoms were permanent, no

17   reasonable accommodation could be made.

18       Based on Dr. Decker's report, Defendant moved Plaintiff from

19   administrative leave to sick leave status on January 5, 2006. (Moberg Decl., Ex. H,

20   bates 1098-99). On January 12, 2006, Plaintiff was placed on unpaid FMLA leave

21   retroactive to January 5, 2006. (Moberg Decl., Ex. H, bates 1108-09).[3] On

22   February 3, 2006, Plaintiff's primary physician, Dr. Gondo, released Plaintiff to

23   work "at full duty status in reference to 1/05/06 Family Medical Leave Act."

24   _____

25       [3] Plaintiff's statement of facts indicates that Plaintiff was returned to

26   administrative leave status on March 13, 2006, but does not specify the reason

27   why, nor cite to evidence of this in the record. (PSOF ¶ 28).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
28   **JUDGMENT** * 9

(Moberg Decl., Ex. H, bates 1147). In his briefing, Plaintiff contends that Defendant failed to return him to work despite this release; Defendant contends that Dr. Gondo had been treating Plaintiff only for the physical injuries from his December 1, 2005, car accident, so his purported "release" related only to those physical injuries.[4]

On May 25, 2006, Defendant sent Plaintiff a Notice of Pre-Termination Hearing, noting that, "According to the most reliable medical evaluation regarding your psychological fitness for duty, it appears that you will never be able to work again as a police officer." (Dep. Ex. 18). The notice set a hearing date of June 2, 2006, at which Plaintiff could present information to refute Defendant's position.

Also on May 25, 2006, Plaintiff sent an email to a Capt. Light after being served with his pre-termination notice in Capt. Light's presence. (Moberg Decl., Ex. H, bates 1545). In the email, Plaintiff alleges that two YPAL checks bounced for insufficient funds, and suggests that Ofc. Dejournette and Lt. Merryman may have been involved in some impropriety regarding YPAL's funds. Capt. Light forwarded the email to Chief Granato.

The police union hired Norman Mar, Ph.D., to review Plaintiff's various evaluations and offer a second opinion. (Dep. Ex. 49). In a report dated March 30, 2006, Dr. Mar did not dispute that Plaintiff "continues to experience emotional, cognitive, behavioral, and physical problems related to the accident of almost six years ago," but noted several concerns with the finality of Dr. Decker's prognosis and inconsistencies between various reports. (Dep. Ex. 49, p. 2). However, Dr. Mar was unwilling to offer a definitive conclusion without first examining Plaintiff.

In response to this information, Defendant continued the pre-termination

---

[4] During oral argument on this motion, Plaintiff's counsel conceded that Dr. Gondo had treated Plaintiff for physical injuries only.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 10

hearing until August 3, 2006. On that date, Dr. Mar issued a second report based on his review of the record and his subsequent examinations of Plaintiff. (Dep. Ex. 47). Dr. Mar confirmed "virtually all of the symptoms and behavior patterns" reported by Dr. Decker and concurred that Plaintiff was presently unfit for duty. (Dep. Ex. 47, p. 2). However, Dr. Mar believed that Plaintiff's symptoms were more likely due to preexisting and continuing "personality characteristics and emotional issues" that were exacerbated, rather than caused by, Plaintiff's automobile accident. (Dep. Ex. 47, p. 2). Dr. Mar concluded that these issues were amenable to treatment, "and given a very intensive and aggressive course of treatment, he will be able to return to his full range of duties in about three months." (Dep. Ex. 47, p. 3). On August 14, 2006, Dr. Decker issued a second report after reviewing Dr. Mar's evaluation, again concluding that Plaintiff was permanently unfit for duty and that no reasonable accommodation was possible. (Dep. Ex. 46).

Defendant held a second pre-termination hearing on September 6, 2006, at which City Manager Richard Zais allowed Plaintiff six additional weeks to complete Dr. Mar's recommended treatment. (Moberg Decl., Ex. H, bates 1779-81). Plaintiff began a course of treatment with a psychologist, Dr. Newell, in September 2006. On December 22, 2006, Dr. Mar reviewed Dr. Newell's treatment summary and reported to the police union attorney that, "Given Mr. Brownfield's treatment progress and with continued treatment, it is my opinion that Mr. Brownfield would be able to return to his full and normal duties as a Yakima Police Officer." (Dep. Ex. 122, p. 2).

Defendant referred Dr. Mar's report to Dr. Decker and to a psychologist, William Ekemo, Ph.D., for evaluation. On January 11, 2007, Capt. Copeland sent a letter asking Dr. Ekemo to conduct a neuropsychological examination of Plaintiff,

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 11

but informing him that "Dr. Decker will be making the final recommendation once she has received your material." (Moberg Decl., Ex. H, bates 2524). On January 17, 2007, Plaintiff informed Capt. Copeland that he had given Dr. Decker a 90-day notice of his intent to sue her for medical malpractice. (Moberg Decl., Ex. H, bates 2646). Capt. Copeland then asked Dr. Ekemo to perform the entire FFDE himself. (Moberg Decl., Ex. H, bates 3054). On January 23, 2007, Mr. Zais ordered Plaintiff to attend the FFDE with Dr. Ekemo. (Moberg Decl., Ex. H, bates 3057). The FFDE was scheduled for February 15, 2007. (Moberg Decl., Ex. H, bates 3168). Before that date, Plaintiff and Mr. Zais exchanged correspondence regarding the lawfulness of the order to attend a third FFDE. (Moberg Decl., Ex. H, bates 3274-75, 3289-90). Mr. Zais informed Plaintiff that the order was lawful and reiterated the order.  (Moberg Decl., Ex. H, bates 3289-90).

On February 15, 2007, Plaintiff reported for the FFDE with Dr. Ekemo, who took a comprehensive history and began some psychological testing. (Moberg Decl., Ex. H, bates 3434). Dr. Ekemo asked Plaintiff to return on March 6, 2007, to complete the evaluation, and Plaintiff agreed. On February 26, 2007, Plaintiff's counsel sent a letter to Dr. Ekemo informing him that Plaintiff would not be attending the second part of the FFDE. Dr. Ekemo declined to provide an opinion based on the incomplete FFDE. On March 1, 2007, Mr. Zais sent Plaintiff a letter ordering him to attend the second phase of Dr. Ekemo's evaluation as scheduled. (Dep. Ex. 22). Plaintiff did not.

Defendant set another pre-termination hearing for March 19, 2007.  (Moberg Decl., Ex. H, bates 3490-99). Following that hearing, Mr. Zais sent Plaintiff a Notice of Termination, terminating Plaintiff's employment for insubordination (failure to complete the FFDE) and unfitness for duty. (Dep. Ex. 118). Union appeals of Plaintiff's termination were denied on May 18, 2007, and June 13, 2007.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 12

1  (Moberg Decl., Ex. H, bates 4181-82, 4291).

2  *Chief Granato's Hiring and Retention*

3  Defendant hired Samuel Granato as Chief of Police in September of 2003.

4  Before hiring Granato, Defendant reviewed a report prepared by a placement

5  consulting agency, the Waldron Company, as well as a week-long investigation

6  conducted by a Captain of the Yakima police department, Jeff. Schneider.

7  (Schneider Decl., Ex. 3). The hiring decision was made by a committee including

8  the City Manager, Richard Zais, as well as several other individuals. (Second

9  Moberg Decl., Ex. A, Zais Dep., p. 30).

10  Plaintiff points to a number of events in Granato's past of which Defendant

11  knew or should have known prior to his hiring. These include his termination as

12  Chief of Police in Kingsville, Texas, in July of 2003; two lawsuits by police

13  officers formerly under Granato against him and the cities that employed him,

14  which ended in settlement; an offense report filed by police officers alleging that

15  Granato compromised an undercover investigation; a grand jury indictment of

16  Granato in May 2003, for felony retaliation; and an allegation that Granato

17  interfered with a subsequent investigation. (PSOF, pp. 19-22). Plaintiff also

18  contends that Capt. Schneider's investigation was deficient because he failed to

19  interview several key witnesses. (PSOF, pp. 21-22).

20  Defendant contends that the hiring committee was fully aware of Granato's

21  "baggage," but, based on the investigations conducted by the Waldron Company

22  and Capt. Schneider, felt "confident at the end of the day the chief would be

23  exonerated from those allegations and that we could go forward with an

24  appointment for a position we needed to fill and with a candidate that filled our

25  needs in multiple areas." (Second Moberg Decl., Ex. A, Zais Dep., pp. 28, 34).

26  **STANDARD OF REVIEW**

27
28  **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 13

1     Summary judgment shall be granted when "the pleadings, depositions,

2  answers to interrogatories, and admissions on file, together with the affidavits, if

3  any, show that there is (1) no genuine issue as to (2) any material fact and that (3)

4  the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

5  56(c). When considering a motion for summary judgment, a court may neither

6  weigh the evidence nor assess credibility; instead, "the evidence of the non-movant

7  is to be believed, and all justifiable inferences are to be drawn in his favor."

8  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "material fact" is

9  determined by the substantive law regarding the legal elements of a claim. *Id.* at

10  248. If a fact will affect the outcome of the litigation and requires a trial to resolve

11  the parties' differing versions of the truth, then it is material. *S.E.C. v. Seaboard*

12  *Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982). A dispute about a material fact is

13  "genuine" if the evidence is such that a reasonable jury could return a verdict for

14  the nonmoving party. *Liberty Lobby,* 477 U.S. at 248.

15     The moving party has the burden of showing the absence of a genuine issue

16  as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). In

17  accord with Rules of Civil Procedure  56(e), a party opposing a properly supported

18  motion for summary judgment "may not rest upon the mere allegations or denials

19  of his pleading, but... must set forth specific facts showing that there is a genuine

20  issue for trial." *Id.* Summary judgment is appropriate only when the facts are fully

21  developed and the issues clearly presented. *Anderson v. American Auto. Ass'n*, 454

22  F.2d 1240, 1242 (9th Cir. 1972). "Rule 56(c) mandates the entry of summary

23  judgment against a party who fails to make a showing sufficient to establish the

24  existence of an element essential to that party's case, and on which that party will

25  bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

26  (1986).

27

28  **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT** * 14

1        **ANALYSIS**

2        Plaintiff's Complaint asserts the following causes of action: (1) retaliation

3   against Plaintiff for reporting fellow officers' unlawful conduct, in violation of

4   Plaintiff's First Amendment rights, Title VII of the Civil Rights Act of 1964, 42

5   U.S.C. § 1983 *et seq.*, and the Washington Law Against Discrimination (WLAD),

6   RCW 49.60; (2) retaliation for whistleblowing activities, in violation of the

7   WLAD; (3) "EEOC Claim," alleging violations of Titles I and V of the Americans

8   with Disabilities Act (ADA), 42 U.S.C. §§ 12111 *et seq.* and 12203; (4) violations

9   of the Family Medical Leave Act (FMLA), 42 U.S.C. § 2601 *et seq.*, and the

10  Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 300 gg

11  *et seq.*; and (5) negligent hiring, retention, supervision, and training of Chief

12  Granato, in violation of state law and 42 U.S.C. § 1983. The Court will consider

13  Plaintiff's causes of action in the order set forth in the parties' briefs.

14                          *I. ADA Claim*

15       Plaintiff argues that Defendant violated the ADA by subjecting him to a

16  FFDE without meeting the ADA's business necessity exception, and by firing him

17  when he attempted to assert his rights under the ADA. Defendant argues that the

18  undisputed facts establish the existence of a valid business necessity, and that

19  Defendant had a valid non-discriminatory reason (insubordination) for firing

20  Plaintiff.

21       The ADA prohibits examinations like FFDEs for any employee, whether

22  disabled or not, "unless such examination or inquiry is shown to be job-related and

23  consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The business

24  necessity exception is met where "health problems have had a substantial and

25  injurious impact on an employee's job performance." *Yin v. California*, 95 F.3d

26  864, 868 (9th Cir. Cal. 1996). Regarding a "business necessity" requirement in

27

28  **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
    JUDGMENT** * 15

1   another provision of the ADA, the Ninth Circuit has noted that, "the 'business

2   necessity' standard is quite high, and is not to be confused with mere expediency."

3   *Cripe v. City of San Jose*, 261 F.3d 877, 890 (2001) (internal quotation omitted).

4        The parties spend considerable time debating the applicability of a recent

5   district court decision granting summary judgment to an employer on a business

6   necessity claim. *Menchaca v. Maricopa Cmty. College Dist.*, 595 F. Supp. 2d 1063,

7   1076-77 (D. Ariz. 2009). There, a teacher suffered from a mental impairment

8   caused by a traumatic brain injury she sustained in an automobile accident. *Id.* at

9   1065. The teacher's emotional volatility culminated in a threat to her supervisor

10  that if she reported the teacher's comings and goings, "'I'll come back and kick

11  your ass.'" *Id.* at 1066. Judge Snow found that the employer "was objectively

12  justified in requiring a medical examination of Menchaca's ability to work while

13  subject to a mental impairment that caused her to threaten others." *Id.* at 1076. The

14  court disregarded the teacher's arguments that the employer's subjective intentions

15  negated business necessity, noting that the test is an objective one. *Id.* (citing *Tice*

16  *v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001); *Sullivan v. River*

17  *Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999)).[5]

18       Plaintiff argues that the reasons for the FFDE Capt. Copeland articulated in

19  his memo to Dr. Decker do not meet the business necessity exception, citing the

20  opinion of his retained expert in support. (Miller Decl., p. 3, ¶ 5, finding nothing in

21  the record "which points to specific duty-related impairments that would justify a

22  referral for a psychological FFD").

23       The undisputed facts establish that Plaintiff demonstrated a pattern of highly

24  emotional responses to a number of situations he encountered during the course of

25  _____

26       [5] At oral argument, both parties agreed that the business necessity standard is

27  objective.

    **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
28  **JUDGMENT** * 16

employment between May 2005 and September 28, 2005. This pattern included: Plaintiff's emotional breakdown, insubordination, and verbal abuse during the meeting with Lt. Merryman and Sgt. Amos on May 11, 2005; Plaintiff's emotional reactions during the internal investigation of the incident with Ofc. Salinas; Plaintiff's shaking arm and leg during the traffic stop in August 2005; and his fellow officer's report on September 28, 2005, that Plaintiff was exhibiting symptoms of depression and needed professional counseling. In addition, Defendant knew Plaintiff was going through a stressful divorce during which both he and his ex-wife had called the police on each other. During his interview with Lt. Finch following the events of May 11, Plaintiff himself acknowledged that his emotional issues stemming from his automobile accident forced him to take a "timeout" when he reached a certain level of "agitation." (Dep. Ex. 9, p. 23).

On this record, no reasonable jury could find that Defendant did not have a substantial and legitimate objective basis to question whether Plaintiff was emotionally stable enough to interact safely with the public and fellow officers, in a job where "timeouts" are frequently unavailable. Put another way, the undisputed facts establish that Plaintiff's emotional issues had already had a substantial and injurious impact on Plaintiff's job performance. *Yin*, 95 F.3d at 868. Consequently, the Court finds no genuine issue of material fact as to whether the FFDE referral was warranted.

Plaintiff also argues that his firing in 2007 constituted retaliation for engaging in activity protected under the ADA, to wit: "asserting his right under the ADA to not submit to an unlawful fitness for duty exam." (Plaintiff's Memorandum in Opposition, p. 14, ln. 4). The necessary corollary of Plaintiff's argument is that if the order to attend the second phase of the FFDE with Dr. Ekemo was lawful, then his conduct was not activity protected by the ADA.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 17

1    Given the absence of genuine issues of material fact with respect to the

2    propriety of the first FFDE referral, it must follow that Mr. Zais's order to attend

3    the FFDE with Dr. Ekemo was also lawful. At the time Mr. Zais issued that order,

4    Defendant had the following information: (1) Dr. Decker's conclusion that Plaintiff

5    was permanently unfit for duty; (2) Dr. Mar's conclusion that Plaintiff was

6    presently unfit for duty, but would be fit for duty after three months of aggressive

7    therapy; and (3) following a course of aggressive therapy, Dr. Mar's second

8    conclusion that Plaintiff "would" be fit for duty at an unspecified time if he

9    continued with treatment. Again, no reasonable jury could find that Defendant

10   lacked a business necessity justifying an additional FFDE to reconcile this

11   conflicting information.

12     Accordingly, the Court grants summary judgment on this cause of action.

13          *II. First Amendment Claim*

14     In his response to Defendant's motion for summary judgment, Plaintiff

15   focuses this cause of action solely on alleged violations of the First and Fourteenth

16   Amendments, cognizable through 42 U.S.C. § 1983. Plaintiff does not repeat or

17   explain the Complaint's allegation that Defendant's conduct in this context

18   violated Title VII or the WLAD. Therefore, the Court concludes that he has

19   abandoned those claims.

20     "It is well settled that the state may not abuse its position as employer to

21   stifle 'the First Amendment rights [its employees] would otherwise enjoy as

22   citizens to comment on matters of public interest.'" *Eng v. Cooley*, 552 F.3d 1062,

23   1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 569, 568 (1968)).

24   Accordingly, courts balance employees' First Amendment interests against "the

25   interest of the State, as an employer, in promoting the efficiency of the public

26   services it performs through its employees." *Pickering*, 391 U.S. at 568. To

27
28   **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
     **JUDGMENT** * 18

determine whether a First Amendment retaliation violation has occurred, the Court must consider the following questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng*, 552 F.3d at 1070.

The parties focus most of their briefing and argument on whether Plaintiff's speech touched on matters of public concern – that is, whether the speech concerns issues "of vital interest to citizens in evaluating the performance of their government," *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992), or simply deals with "individual personnel disputes and grievances," *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). The Court finds that Plaintiff's speech consisted primarily of complaints about the unit's unfair workload distribution, Ofc. Dejournette's sloppy work habits and laziness, and favoritism Lt. Merryman showed to Ofc. Dejournette – all of which are the stuff of a personnel dispute, not of vital interest to citizens. As Defendant points out, Plaintiff did not claim any impropriety regarding YPAL's funds other than sloppy bookkeeping until May 25, 2006, well after his first FFDE and Dr. Decker's conclusion that he was unfit for duty.

Even if Plaintiff did speak on a matter of public concern, and could also establish factors two through four in his favor, the Court concludes that this claim founders at the causation stage (the fifth factor) because no reasonable jury could find that an adverse employment action resulted from anything other than Plaintiff's unfitness for duty and his insubordination

The causation question is one of pure fact, and Defendant "may avoid

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT * 19**

liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Eng*, 552 F.3d at 1072. Plaintiff has not identified the precise adverse employment action that he claims is at issue here, instead arguing that "the City bears liability for the department's disparate treatment of, and adverse action against, Ofc. Brownfield, leading up to and including his termination." (Plaintiff's Memorandum in Opposition, p. 29). It seems that two actions are at issue: (1) the first FFDE referral, and (2) Plaintiff's termination.[6] Based on the undisputed facts, the Court finds no but-for causal link between Plaintiff's speech and either of these actions, as a matter of law.

First, because Defendant had a legitimate business necessity for the first FFDE referral, Plaintiff's speech cannot constitute a but-for cause of that referral. Second, Plaintiff does not dispute that Mr. Zais made the final decision to fire him and claims no bias on the part of Mr. Zais – Plaintiff simply argues that Chief Granato retaliated against Plaintiff's protected speech by setting the wheels of termination in motion, and influencing Mr. Zais's decision to terminate. Based on the record the parties have made, no reasonable jury could conclude that the

---

[6] During oral argument, Plaintiff argued that his transfer to patrol duty at some point in 2005 also constituted an adverse employment action. However, the record is clear that Plaintiff himself requested this transfer until he had resolved his issues with Lt. Merryman. (Dep. Ex. 9, p. 4). Plaintiff also argued that the one-sided internal investigation following his encounter with Ofc. Salinas constituted an adverse employment action. It is undisputed that no disciplinary action resulted from that investigation, and Plaintiff cannot demonstrate "the loss of a valuable governmental benefit or privilege" due to the investigation. *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (internal quotation omitted).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 20

1  lengthy termination proceedings conducted by Mr. Zais were a "sham or conduit"

2  for any alleged retaliatory motive on the part of Chief Granato. *Lakeside-Scott v.*

3  *Multnomah County*, 556 F.3d 797, 808-09 (2009) (internal quotation omitted).

4  Third and finally, Plaintiff's speech cannot constitute a but-for cause because

5  Defendant had two legitimate reasons for termination: unfitness for duty and

6  insubordination. Accordingly, summary judgment on this claim is also appropriate.

7  ### III. FMLA Claim

8  The Complaint alleged violations of both FMLA and HIPAA, but Plaintiff

9  has abandoned his HIPAA claim. Plaintiff argues that Defendant violated the

10  FMLA by refusing to restore him to full duty after it received Dr. Gondo's release,

11  and by terminating him for asserting his rights under the FMLA.

12  Plaintiff's arguments misconstrue the record. Plaintiff agrees that he was

13  placed on FMLA leave because of his psychological condition, on the basis of Dr.

14  Decker's report. It is also obvious from the record that Dr. Gondo treated Plaintiff

15  for the injuries that resulted from his car accident of December 1, 2005, and that

16  Dr. Gondo never evaluated or treated Plaintiff for his psychological condition.

17  (Moberg Decl., Ex. H., bates 1147 (specifying diagnoses stemming from an "MVA

18  Collision")). While Dr. Gondo did disagree with Dr. Decker's opinion, he never

19  purported to release Plaintiff to work based on recovery from his psychological

20  condition. Therefore, the Court finds the FMLA claim is without merit, and grants

21  summary judgment accordingly.

22  ### IV. State Law Claims

23  Plaintiff advances claims under the Washington Law Against Discrimination

24  and state tort law (negligent hiring and retention, and unlawful discharge in

25  violation of public policy). Because the Court has granted Defendant

26

27  summary judgment on each of Plaintiff's claims over which the Court has original

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**

28  **JUDGMENT** * 21

jurisdiction, it will decline to exercise supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3).

### CONCLUSION

No genuine issues of material fact exist, and Defendant is entitled to summary judgment on each of Plaintiff's federal claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

Accordingly, **IT IS HEREBY ORDERED:**

1.  Defendant's Motion for Summary Judgment (Ct. Rec. 31) is **GRANTED.**

2.  All pending motions are **DENIED as moot.**

3.  The District Court executive is directed to enter judgment in favor of Defendant on Plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 1983, and the Family Medical Leave Act.

4.  Plaintiff's remaining state law claims are dismissed without prejudice.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order, furnish copies to counsel, enter judgment as directed above, and **close the file.**

**DATED** this 4th  day of June, 2009.

s/Robert H. Whaley<br>
ROBERT H. WHALEY<br>
Chief United States District Court

Q:\CIVIL\2008\Brownfield\grant.sj.ord.wpd

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** * 22